## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT L. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 3113** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Robert Smith's claim for Title XVI supplemental security income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Smith's motion for summary judgment [Doc. No. 17] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner of Social Security for further proceedings.

## BACKGROUND

### I. PROCEDURAL HISTORY

Plaintiff Robert Smith ("Plaintiff," "Claimant," or "Smith") originally filed an application for supplemental security income on May 8, 2007. (R. 38.) Plaintiff's claim was denied initially, and again upon reconsideration by the Social Security Administration. (*Id.*) Plaintiff timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on January 28, 2008. (*Id.*) On November 5, 2008, Plaintiff personally appeared and testified at the hearing. (*Id.*) Plaintiff waived his right to representation. (*Id.*)

On January 27, 2009, the ALJ denied Plaintiff's claim and found him "not disabled" under the Social Security Act. (*Id.* at 41.) On March 9, 2010, the Appeals Council denied Smith's request for review. (R. 10.) The ALJ's decision thus became the final decision of the Commissioner of Social Security ("Commissioner"), and became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). After receiving an extension of time to file a civil action, (R. 1), Plaintiff filed the instant motion on September 26, 2011. [Doc. No. 17.] This matter has been fully briefed since February 15, 2012. [Doc. No. 26.]

## II.     FACTUAL BACKGROUND

### A.     <u>Smith's Reports & Testimony</u>

Smith was born on December 24, 1965, and was forty-two years old on May 8, 2007, the date on which he claims his disability period began. (R. 82.) Smith claims that he has schizophrenia and that the condition limits his ability to work. (R. 105.)

In his Activities of Daily Living Questionnaire, Plaintiff reported that he lives with his mother, and that his mother cooks his meals. (R. 123.) In response to the question, "[h]ow many meals a day do you eat?" Plaintiff responded, "1 Times." (*Id.*) Plaintiff reported that he does cleaning chores everyday, and that he does not do any shopping. (*Id.*) He indicated that his condition has affected his bathing, hair care or dressing, and reported that he takes Wellbutrin everyday. (R. 124.) He also reported that his mother reminds him to attend to his personal care, take his medicine and keep his appointments. (*Id.*) Smith explained that he has problems concentrating, thinking and finishing things that he starts. (*Id.*) He also explained that he is forgetful, that he hears voices and sees people who are not around, and that these hallucinations interfere with his activities. (*Id.*) In response to a request to describe this interference, Plaintiff reported, "[i]t hurt me." (*Id.*) Smith reported that he feels as if someone is watching or trying to harm him and explained that he is paranoid. (R. 125.) Smith also reported that he leaves home all the time when his family members come and get him. (*Id.*) He indicated that he visits family, visits friends, and keeps appointments, and that he usually walks or rides the bus. (*Id.*) Smith reported that he neither enjoys people nor likes to be around them "because

3

they are watching" him. (*Id*.) He reported that he is afraid of people because "[t]hey are trying to hurt" him. (*Id*.) Smith also reported that he tends to get angry and fight with people "because they be laugh at me [and] talking about me." (*Id*.)

In his Work History Report, Smith reported that he has worked at Popeye's Chicken, Church's Chicken, and Harold's Chicken. (R. 128.) In a May 15, 2007 Disability Report, Smith "vehemently denied ever working." (R. 110.)

At the hearing, Plaintiff testified that he worked most recently in 1995 as a cook in a restaurant, and that he quit but did not remember why. (R. 21.) Plaintiff testified that he has been incarcerated six times for burglary. (R. 21-22.) Plaintiff reported that he gets headaches often. (R. 22-23.) The ALJ asked "[w]hat do you take [for the headaches]?" Plaintiff responded, "I'm a asthmatic." (R. 23.) The ALJ asked what medications Plaintiff took for the asthma, and Plaintiff said that he took albuterol. (R. 23-24.) The ALJ asked, "[d]o you take anything else besides albuterol?" Plaintiff said, "[y]es." The ALJ said, "[w]hat else?" Plaintiff said, "My statutory rape case, I forgot the name of it." (R. 24.)

Plaintiff testified that he hears voices that tell him to hurt himself. (R. 25.) Plaintiff testified that he has tried to commit suicide four times. (R. 26.) Plaintiff also testified that he has filled out several applications trying to get a job as a dishwasher. (R. 27.) Plaintiff said that he believed he could do the job and keep it, and that he would probably be able to go to work every day." (*Id*.) Plaintiff also testified that he babysits his nieces and nephews occasionally, but that he never takes care of them by himself because the children's parents do not trust him. (R.

4

28-29.) Plaintiff testified that when he watches a television show, he sits down and watches the entire program. (R. 31.) The ALJ queried whether the main problem Plaintiff was having involved crime and drinking. Plaintiff responded, "[i]t's not the, yes." (R. 32.)

### B. **Medical Evidence**

#### 1. *Lawrence Correctional Center Records*

A Mental Health Crisis Care report indicates that Plaintiff was placed on suicide watch on January 6, 2006 because he was "hearing voices to bang head against wall." (R. 341.) A Crisis Care Infirmary Admission Note indicates that Plaintiff was placed on "close supervision" because of his delusions, paranoia, and suicidal ideation. (R. 313.) On January 27, 2006, Dr. Andrew Kowalkowski reported that Plaintiff had a history of hearing voices. (R. 346.) Various progress notes and treatment notes indicate that Plaintiff experienced a variety of psychological problems, including involuntary body movements, (see, e.g., R. 320), paranoia and psychosis, (see, e.g., 168), and anxiety and major depressive disorder. (R. 358.) The records from Lawrence Correctional Center also reveal that Plaintiff has a history of suicide attempts, (R. 170, 344, 346) and was prescribed Haldol, (R. 319), Celexa, (R. 237), and Wellbutrin. (R. 364.).

#### 2. *Dr. Langgut's Consultative Examination*

On August 1, 2007, Plaintiff saw Dr. Mark Langgut ("Dr. Langgut") for a consultative examination, and the doctor issued his Report of Psychological Assessment on August 7, 2007. (R. 377.) Dr. Langgut reported that Plaintiff

"presented as an anxious, chaotic individual who had difficulty with social interaction." (*Id*.) However, Plaintiff was "alert and oriented to time, place, and person." (*Id*.) His speech was clear, he was appropriately groomed, and adequately dressed. (*Id*.) Dr. Langgut reported that Plaintiff suffers from asthma and headaches, and that he has had "about three psychiatric hospitalizations at Northwestern Memorial Hospital, including one in 2003 due to auditory hallucinations and self-harm." (R. 378.) Dr. Langgut also reported that Plaintiff was hospitalized in 1989 after a suicide attempt, and that Plaintiff takes prescription medication for his depression and the auditory hallucinations. (*Id*.) Dr. Langgut indicated that Plaintiff attends therapy at the Bobby Wright Mental Health Center, "but often misses appointments and has been inconsistent in his attendance." (*Id*.)

Dr. Langgut reported that Plaintiff reported depressive symptoms of hopelessness, sleep problems, irritability, and daily mood disturbance. (*Id*.) The doctor explained that Plaintiff's report of feeling depressed most of the day, for more days than not, for at least two years suggested a diagnosis of dysthymia. (*Id*.) Dr. Langgut reported that there were no indications of mania. (R. 378-79.) Dr. Langgut also reported that "[b]ehavioral abnormalities consistent with his diagnosis were observed."

Dr. Langgut reported that Plaintiff has impaired long-term memory, and a limited fund of information and/or an impaired ability to access it. (R. 379.) When asked to identify five large cities, Plaintiff was only able to come up with "Chicago" after prompting. (*Id*.) Plaintiff displayed computational skills inconsistent with the

6

management of his own funds: "[h]e did not know how to subtract continuous seven's or continuous three's from 100. He divided nine by three to equal 'six.'" (*Id.*) Dr. Langgut also reported that Plaintiff's abstract reasoning processes and judgment are impaired. (*Id.*) Dr. Langgut explained that Plaintiff "had persecutory delusions of mild intensity. He reported daily auditory, visual, olfactory, and gustatory hallucinations of moderate intensity. He sometimes has tactile hallucinations as well. He hears voices telling him to 'watch [his] back.'" (*Id.*) Dr. Langgut diagnosed Plaintiff with schizoaffective disorder, alcohol dependency, and personality disorder with paranoid features. (R. 380.)

### 3. *Dr. Rozenfeld's Psychiatric Review Technique*

On August 31, 2007, Dr. Ellen Rozenfeld ("Dr. Rozenfeld") completed a Psychiatric Review Technique. (R. 381.) Dr. Rozenfeld indicated that a Residual Functional Capacity ("RFC") assessment was necessary, and that the categories upon which the medical disposition is based included affective disorders, personality disorders and substance addiction disorders. (*Id.*) Dr. Rozenfeld found that Plaintiff had "moderate" difficulties in maintaining social functioning; "moderate" restrictions in activities of daily living; and "moderate" difficulties in maintaining concentration, persistence, or pace. (R. 391.) Dr. Rozenfeld also reported that Plaintiff had no episodes of decompensation. (*Id.*)

Dr. Rozenfeld reported that Plaintiff is partially credible, and that Plaintiff's mental impairment was fairly well controlled while he was incarcerated. (R. 393.) Dr. Rozenfeld also reported that after being released, he has failed to follow-up on

treatment and has abused alcohol on a daily basis. (*Id.*) Dr. Rozenfeld concluded that Plaintiff "retains sufficient mental capacity to perform operations of a simple and routine nature on a sustained basis." (*Id.*) At the end of her notes, Dr. Rozenfeld indicated that examiners were to "see MRFC." (*Id.*)

## C.   **ALJ Decision**

In her findings, the ALJ stated that Smith had not engaged in substantial gainful activity since May 8, 2007, the date he filed his Title XVI application. (R. 42.) The ALJ also determined that "[t]he medical evidence establishes that the claimant has a 'severe' impairment: an affective disorder, a personality disorder and a substance addiction disorder, but that he does not have an impairment, or combination of impairments, of severity to meet or medically equal the requirements of the Listing of Impairments." (*Id.*) The ALJ found that Plaintiff "has the residual functional capacity to perform the physical exertion and nonexertional requirements of unskilled medium level work activity." (*Id.*) The ALJ found that Plaintiff had no past relevant work history, that Plaintiff was a "younger person," and that transferability of work skills was not an issue in the case. (*Id.*) The ALJ determined that "Section 416.969 of Regulations No. 16, and Rule 203.25, Table No. 3 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled." (*Id.*)

In the ALJ's evaluation of the evidence, she referenced some of Plaintiff's testimony, including that Plaintiff heard voices, that he performs household chores,

that he babysits his nieces and nephews, that he drinks beer and gin occasionally, and that he was seeking employment and had testified that he could perform a dishwashing job. (R. 39.) The ALJ reported that Plaintiff was examined by Dr. Langgut, and mentioned Dr. Langgut's impressions. (R. 40.) The ALJ did not indicate whether she accorded any weight to Dr. Langgut's opinion. The ALJ also reported that Dr. Rozenfeld completed a Psychiatric Review Technique, and noted the limitations Dr. Rozenfeld found. (*Id.*) The ALJ indicated that she accepted "State Agency reviewing psychologist Rosenfield's (*sic*) opinion that the claimant's impairments do not meet, or medically equal the requirements of the Listing of Impairments because his (*sic*) opinion is supported by the evidence." (*Id.*) The ALJ indicated that she "accepts (and adopts) the opinion of Dr. Rozenfeld with regard to the "B" criteria of te relevant Listing sections and, in addition, finds that the claimant retains the residual functional capacity to perform unskilled medium level work activity." (R. 41.)

The ALJ also noted that "there is nothing in the way of an assessment from a treating source to indicate that the claimant experiences any significant psychological related (*sic*) symptoms or limitations." (R. 40.) The ALJ reported there was "nothing from a treating source to corroborate" Plaintiff's claims of hearing voices. (*Id.*) The ALJ found that Plaintiff was not receiving psychological treatment. (*Id.*) The ALJ also determined that "[d]espite his allegations of audio hallucinations and his acknowledged drinking, the claimant testified to fairly normal activities." (R. 41.) And the ALJ referenced the Activities of Daily Living Questionnaire that

9

Plaintiff's mother completed, finding that Plaintiff helps with some household chores, that he is independent in self care, that he leaves the house daily with a friend, that he is able to go out alone, that he is able to handle cash transactions, and that he watches television and sports. (*Id.*) The ALJ repeated and placed significance on Plaintiff's testimony that "he believes that he can work and in fact is actively seeking employment." (*Id.*) The ALJ emphasized that Plaintiff said that he could perform a dishwasher job, and that "he would go to work everyday and [could] utilize public transportation to travel to and from the workplace." (*Id.*)

## DISCUSSION

### I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.   JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning

11

behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

## III.    ANALYSIS

In his motion for summary judgment, Davis alleges a number of errors related to the ALJ's determination, including: (1) the ALJ failed to make a credibility determination; (2) the ALJ failed to consider relevant medical evidence; and (3) the ALJ failed to include a narrative discussion describing how the evidence supported the RFC.

### A.    <u>Credibility</u>

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record.  *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is

unreasonable or unsupported . . . can the finding be reversed.'"). While a reviewing court "must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), [the court] must first be certain that a credibility determination has actually been made." *Schroeter v. Sullivan*, 977 F.2d 391, at 394-95 (7th Cir. 1992) (internal citations omitted), *quoted in Spaulding v. Barnhart*, No. 05 C. 6311, 2007 WL 1610445, at *6 (N.D. Ill. Mar. 2, 2007). An ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

The ALJ made some references to Plaintiff's testimony that may imply an adverse credibility finding, but there is no clear credibility determination in the decision. The statements that come closest to such a determination consist of the following: "At the hearing the claimant complained of hearing voices. There is nothing from a treating source to corroborate this allegation. The claimant is not receiving psychological treatment." (R. 40.) Contrary to the Commissioner's assertion, these statements do not amount to a credibility finding; on the contrary, they point out the distinct need for a credibility determination. The ALJ claimed that there was no treating-source corroboration of Plaintiff's claim; therefore, whether the ALJ believed that Plaintiff "heard voices" depended on how credible she found him to be. Because it is unclear whether the ALJ found Plaintiff's claims

13

credible or not, there is no way for this Court to determine how Plaintiff's credibility, or lack thereof, factored into the ALJ's decision. Therefore, the case is to be remanded so that the ALJ may reassess Plaintiff's credibility in light of all the evidence of record and make a clear and explicit credibility determination.

Because of its potential for confusion, it is worth noting one other argument that Defendant makes in response to Plaintiff's credibility argument and in support of the ALJ's RFC generally. Defendant emphasizes that Plaintiff testified that he applied for several dishwasher positions, and stated that he believed he would be able to keep such a job and get to work every day using public transportation. [Doc. No. 25, at 4, 7.] It is unclear how such testimony supports Defendant's argument that there was a credibility finding and that Plaintiff's credibility was properly assessed. Defendant's chain of logic *seems* to be that Plaintiff's testimony cut against his claim of disability, and that such an inconsistency resulted in the ALJ's finding that Plaintiff lacked credibility. However, the ALJ did not make such an argument: the ALJ's reference to Plaintiff's testimony regarding the dishwasher job was not in the context of the ALJ's determination of Plaintiff's credibility. Furthermore, Defendant fails to explain how such testimony establishes that there was a credibility finding in the first place.

Defendant's use of the testimony in support of the RFC generally makes more sense; nevertheless Defendant's reasoning is flawed. While such a statement by a disability claimant should likely result in a finding of non-disability in many cases, the ALJ should not use such testimony as an excuse not to perform comprehensive

14

analysis. The ALJ's decision in this case was noticeably brief. The portion of the

decision that is unique to Plaintiff–that is, the portion that does not consist of the

law found in every such decision–amounts to just under two pages, hardly enough

room to consider the evidence and explain one's conclusions. The diminutive nature

of the decision, however, is not the primary problem. Nowhere in the decision does

the ALJ consider the unique difficulties inherent in determining the reliability[1] of a

claimant alleging a mental condition, illness or disability. Plaintiff complains that

he suffers from schizophrenia, "which among other things, means that his grip on

reality may not be as firm as that of a 'normal' person." *Davis v. Astrue*, No. 11 C

0056, 2012 WL 983696, at *15 (N.D. Ill. Mar. 21, 2012). While the ALJ and

Defendant tout Plaintiff's testimony as proof that he lacks credibility or is not

disabled, it is entirely possible that Plaintiff's testimony "may serve to support the

---

[1] Reliability is related to credibility, but it is a distinct concept. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *15 (N.D. Ill. Mar. 21, 2012).

> Generally, the credibility determination concerns whether a disability claimant is truthfully presenting his symptoms and limitations or whether he is intentionally misrepresenting or exaggerating them. "Reliability," on the other hand, is a more expansive concept and also implicates an individual's *capacity* to describe or explain various facts about himself or his environment. Of course, the words [may be used interchangeably] in many cases; in others, however, it is possible for an individual to [be] unreliable even though one is trying to tell the truth. An individual's reliability might be compromised by memory, perspective, time, sensory capability, intelligence and/or competence.

*Id.*

notion that he is unreliable *because* of his alleged psychological condition."[2] *Id.* Indeed, that Plaintiff's testimony was so obviously against his own interests and the very heart of his claim should have suggested that portions of his reports and testimony might have been indications of his disabling mental condition rather than unintentional admissions of his capabilities. This is not to say that an ALJ is precluded from utilizing testimony of claimants alleging mental conditions to support conclusions of non-disability; instead, an ALJ needs to scrutinize such testimony in light of *all* other relevant evidence of record,[3] consider the conclusions that such testimony could support, and explain her determinations regarding a claimant's reliability and credibility.

---

[2] For example, in one part of the record, Plaintiff maintains that he has never worked (R. 105) and "vehemently denied ever working." (R. 110.) However, in another part of the record, he explains that he worked at several different restaurants. (R. 21, 128.) The ALJ did not mention these reports. While such an inconsistency could yield the conclusion that Plaintiff lacks credibility, it could also be the case that Plaintiff's reports are unreliable because of his mental condition.

[3] In this case, the ALJ routinely only considered evidence that favored her ultimate conclusion. For example, the ALJ referenced the Activities of Daily Living Questionnaire completed by Plaintiff's Mother, but she only mentioned those answers that favored a finding of non-disability. The ALJ failed to mention that Plaintiff's Mother reported that Plaintiff's condition affects his sleep, that he needs special reminders to take care of personal needs and grooming, that he does not prepare any of his meals or shop for himself, that he does not handle his own finances (contrary to what the ALJ reported), that he always argues with people, that he thinks people are out to get him, that he has to be reminded to go places, that his condition has affected his abilities to talk, understand, follow instructions, remember things, concentrate and get along with others, that he cannot pay attention for long periods, that he does not finish what he starts, that he cannot follow written or spoken instructions well, that he does not get along with authority figures well, that he does not handle stress well, and that he exhibits unusual behavior and gets very paranoid. (R. 115-20.) The ALJ also did not mention the Activities of Daily Living Questionnaire filled out by Plaintiff. Many of Plaintiff's answers are clearly at odds with the ALJ's conclusions. (R. 123-25.)

### B.     Consideration of Medical Evidence and Opinions

"The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). "[M]eaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). "Although a written evaluation of each piece of evidence or testimony is not required, [an ALJ may not] select and discuss only that evidence that favors his ultimate conclusion. *Id.* (citing *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)). The ALJ has a duty to develop a fair and full record, and this duty "is enhanced when a claimant appears without counsel." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). In such cases, the ALJ must "scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts." *Id.* (quoting *Thompson v. Sullivan*, 933 F.2d 581, 585-86 (7th Cir. 1991)). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). Instead, "a claimant must set forth specific, relevant facts–such as medical evidence–that the ALJ did not consider." *Nelms*, 553 F.3d at 1098 (citing *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997)).

17

Here, the ALJ failed to mention any of the medical evidence from Lawrence Correctional Center.[4] As Plaintiff points out, while the evidence does not explicitly include an opinion as to Plaintiff's RFC, there is certainly evidence relevant to Plaintiff's mental condition. A Mental Health Crisis Care report indicates that Plaintiff was placed on suicide watch on January 6, 2006 because he was "hearing voices to bang head against wall." (R. 341.) A Crisis Care Infirmary Admission Note indicates that Plaintiff was placed on "close supervision" because of his delusions, paranoia, and suicidal ideation. (R. 313.) On January 27, 2006, Dr. Andrew Kowalkowski reported that Plaintiff had a history of hearing voices. (R. 346.) Various progress notes and treatment notes indicate that Plaintiff experienced a variety of psychological problems, including involuntary body movements, (see, e.g., R. 320), paranoia and psychosis, (see, e.g., 168), and anxiety and major depressive disorder. (R. 358.) The records from Lawrence Correctional Center also reveal that Plaintiff has a history of suicide attempts, (R. 170, 344, 346) and was prescribed Haldol, (R. 319), Celexa, (R. 237), and Wellbutrin. (R. 364.). Not only is much of the evidence relevant to Plaintiff's mental condition, but some of it is inconsistent, if not directly at odds, with portions of the ALJ's most determinative statements. For example, the ALJ reported that "there is nothing in the way of an assessment from a treating source to indicate that the claimant experiences any significant psychological related (*sic*) symptoms or limitations," and that "nothing from a

---

[4] Notably, the evidence from Lawrence Correctional Center, which amounted to over 200 pages, constituted over half of the administrative record.

18

treating source" corroborated Plaintiff's complaint that he heard voices. (R. 40.) The contents of the records from Lawrence Correctional Center demonstrate that there was evidence of significant psychological symptoms, establish that the ALJ was mistaken about there being no corroboration from a treating source regarding the voices Plaintiff claimed to hear, and strongly suggest that the records were completely ignored.

The Commissioner argues that the Lawrence Correctional Center records do not demonstrate that Plaintiff has greater limitations than those found by the ALJ, and that they are actually more harmful to Plaintiff's disability claim than they are helpful. [Doc. No. 25, at 5.] Specifically, Defendant claims that while there are some references to Plaintiff's delusions and paranoia, Plaintiff only points to one episode where Plaintiff complained of hearing voices. [*Id.*] Defendant explains that while Dr. Kowalkowski noted that Plaintiff had a history of hearing voices, he also reported that Plaintiff had not heard them in several months. [*Id.*] Defendant also argues that Plaintiff's history of suicide attempts does not shed light on Plaintiff's symptoms and functioning after May 2007. [*Id.*] Defendant claims that the diagnosis for major depressive disorder revealed by the records do not establish the severity of the condition. [*Id.*] Defendant also argues that the post-February 2006 records reveal the absence of significant psychological symptoms and limitations. [*Id.*] Defendant's arguments are unpersuasive. First of all, Defendant does not dispute that the records contain evidence regarding Plaintiff's mental condition, including evidence inconsistent with the ALJ's general statements about what the

19

administrative record does, and does not, contain. Second, there is no reason to accept the proposition that evidence of Plaintiff's condition before May 2007 is irrelevant; on the contrary, evidence of a claimant's medical history is likely highly relevant. Third, Defendant's analysis of the records is perfunctory and incomplete.

Of course, even if Defendant's arguments were convincing, they are most certainly not the arguments of the ALJ. Defendant's arguments do not consist of attempts to support the ALJ's reasoning regarding the Lawrence Correctional Center records; indeed, they cannot be because the ALJ did not mention them. Instead, Defendant's attempt to show how harmful the records are to Plaintiff constitutes a defense of the conclusion that Plaintiff is not disabled on grounds the ALJ herself did not embrace. Such a defense is not allowed. *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A]n ALJ must articulate in a rational manner the reasons for his assessment of a claimant' residual functional capacity, and in reviewing that determination a court must confine itself to the reasons supplied by the ALJ."). Therefore, the matter must be remanded to the Commissioner for a thorough consideration of all of the medical evidence in the record and a detailed explanation of why certain evidence was given greater or lesser weight.[5] The ALJ should also

---

[5] It is worth noting that while there are references in the administrative record to Plaintiff's "three psychiatric hospitalizations at Northwestern Memorial Hospital, including one due to auditory hallucinations and self-harm," Plaintiff's hospitalization in 1989 after a suicide attempt, and Plaintiff's therapy at Bobby Wright Mental Health Center during 2007, (R. 378), direct evidence of those hospitalizations and therapy do not appear in the record. Independent of any other errors, such glaring omissions may justify remand. "Although *pro se* litigants must furnish some medical evidence to support their claim, the

consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that she may build a "logical bridge" between the evidence and his conclusions. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

## C.     **The RFC Assessment**

The RFC is an assessment of what work-related activities the claimant can perform despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). A claimant's RFC is to be "based on all the relevant evidence in the record." *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1). Furthermore, the RFC assessment is to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." SSR 96-8p.[6]

In this case, the ALJ's RFC consisted of the following: "Based on the above discussion of the evidence, the Judge accepts (and adopts) the opinion of Dr. Rozenfeld with regard to the "B" criteria of the relevant Listing sections and, in addition, finds that the claimant retains the residual functional capacity to perform unskilled medium level work activity." (R. 41.) Plaintiff argues that, in addition to the ALJ's failure to consider the Lawrence Correctional Center records, the ALJ's RFC finding failed to account for the limitations Dr. Rozenfeld reported. [Doc. No.

---

ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Nelms*, 553 F.3d at 1098 (citing 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3)) (internal citations omitted).

[6] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency.  20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

18, at 11.] Dr. Rozenfeld found that Smith's mental impairments would cause him "moderate" difficulties in maintaining social functioning; "moderate" restrictions in activities of daily living; and "moderate" difficulties in maintaining concentration, persistence, or pace. (R. 391.) The ALJ neglected to mention how these limitations factored into her RFC determination.

Defendant claims that Dr. Rozenfeld translated his paragraph "B" findings–the aforementioned moderate limitations–and found that Plaintiff retained the ability to perform simple and routine work on a sustained basis. [Doc. No. 25, at 7.] While Dr. Rozenfeld did opine that Plaintiff "retains sufficient mental capacity to perform operations of a simple and routine nature on a sustained basis," (R. 393), the ALJ did not adopt that portion of the doctor's opinion: the ALJ explicitly accepted and adopted the opinion of Dr. Rozenfeld "with regard to the 'B' criteria." (R. 41.) The findings in paragraph "B" did not automatically yield a mental RFC for Plaintiff;[7] therefore, the ALJ's failure to explain the significance of her

_____

[7] Dr. Rozenfeld's opinion was provided in the context of a "Psychiatric Review Technique." According to SSR 96-8p,

> The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the

adoption of those particular determinations leaves this Court without a narrative discussion describing how the evidence supports each of the ALJ's conclusions.[8]

Plaintiff does not argue that the ALJ's failure to discuss the limitations articulated by Dr. Langgut requires remand; however, Defendant, in its heroic attempt to defend the ALJ's RFC, asserts that "[l]imiting Plaintiff to unskilled work accounted for [Dr. Langgut's findings: Plaintiff's] impaired judgment, computation skills, reasoning, and long term memory." [Doc. No. 25, at 8.] This could be the case, but the ALJ did not embrace this reasoning in her decision; in fact, she neglected to mention these limitations at all. More fundamentally, the ALJ failed to explain what weight, if any, she accorded Dr. Langgut's opinion. As such, on remand the ALJ is to provide a narrative that accounts for how the evidence supports Plaintiff's RFC. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and her ultimate conclusions, whatever those conclusions may be. *Myles*, 582 F.3d at 678; *see Smith v. Apfel,* 231 F.3d 433, 437

---

broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

[8] Additionally troubling is the fact that while Dr. Rozenfeld's Psychiatric Review Technique Form indicates that an "RFC Assessment [is] Necessary," (R. 381), and instructs the reader to examine the mental RFC assessment for Plaintiff, (R. 393), no such assessment is present in the administrative record.

(7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Court further emphasizes that this opinion is limited to three major errors justifying remand. The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 17] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner so that new evidence may be considered. for further proceedings consistent with this opinion.

**SO ORDERED.**                          **ENTERED:**

**DATE:** __May 22, 2012__          _____

                                         **HON. MARIA VALDEZ**
                                         **United States Magistrate Judge**